# TENNESSEE VALLEY AUTHORITY *v.* HILL ET AL.

No. 76–1701.   Argued April 18, 1978—Decided June 15, 1978

154

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, MARSHALL, and STEVENS, JJ., joined. POWELL, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 195. REHNQUIST, J., filed a dissenting opinion, *post*, p. 211.

*Attorney General Bell* argued the cause for petitioner. On the briefs were *Acting Solicitor General Friedman, Deputy Solicitor General Barnett, Herbert S. Sanger, Jr., Richard A. Allen, Charles A. Wagner III, Thomas A. Pedersen,* and *Nicholas A. Della Volpe.*

*Zygmunt J. B. Plater* argued the cause for respondents. With him on the brief was *W. P. Boone Dougherty.**

*Briefs of *amici curiae* urging reversal were filed by *Robert J. Pennington* for Monroe County et al.; and by *Ronald A. Zumbrun, Raymond M. Momboisse, Robert K. Best, Albert Ferri, Jr., Donald C. Simpson,* and *W. Hugh O'Riordan* for the Pacific Legal Foundation.

Briefs of *amici curiae* urging affirmance were filed by *Ben Oshel Bridgers* for the Eastern Band of Cherokee Indians; by *William A. Butler* for the Environmental Defense Fund et al.; and by *Howell H. Sherrod, Jr.,* for the East Tennessee Valley Landowners' Assn.

*Ben B. Blackburn* and *Wayne T. Elliott* filed a brief for the Southeastern Legal Foundation as *amicus curiae.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The questions presented in this case are (a) whether the Endangered Species Act of 1973 requires a court to enjoin the operation of a virtually completed federal dam—which had been authorized prior to 1973—when, pursuant to authority vested in him by Congress, the Secretary of the Interior has determined that operation of the dam would eradicate an endangered species; and (b) whether continued congressional appropriations for the dam after 1973 constituted an implied repeal of the Endangered Species Act, at least as to the particular dam.

I

The Little Tennessee River originates in the mountains of northern Georgia and flows through the national forest lands of North Carolina into Tennessee, where it converges with the Big Tennessee River near Knoxville. The lower 33 miles of the Little Tennessee takes the river's clear, free-flowing waters through an area of great natural beauty. Among other environmental amenities, this stretch of river is said to contain abundant trout. Considerable historical importance attaches to the areas immediately adjacent to this portion of the Little Tennessee's banks. To the south of the river's edge lies Fort Loudon, established in 1756 as England's southwestern outpost in the French and Indian War. Nearby are also the ancient sites of several native American villages, the archeological stores of which are to a large extent unexplored.[1] These include the Cherokee towns of Echota and Tennase, the former

---

[1] This description is taken from the opinion of the District Judge in the first litigation involving the Tellico Dam and Reservoir Project. *Environmental Defense Fund* v. *TVA*, 339 F. Supp. 806, 808 (ED Tenn. 1972). In his opinion, "all of these benefits of the present Little Tennessee River Valley will be destroyed by impoundment of the river . . . ." *Ibid.* The District Judge noted that "[t]he free-flowing river is the likely habitat of one or more of seven rare or endangered fish species." *Ibid.*

being the sacred capital of the Cherokee Nation as early as the 16th century and the latter providing the linguistic basis from which the State of Tennessee derives its name.[2]

In this area of the Little Tennessee River the Tennessee Valley Authority, a wholly owned public corporation of the United States, began constructing the Tellico Dam and Reservoir Project in 1967, shortly after Congress appropriated initial funds for its development.[3] Tellico is a multipurpose regional development project designed principally to stimulate shoreline development, generate sufficient electric current to heat 20,000 homes,[4] and provide flatwater recreation and flood control, as well as improve economic conditions in "an area characterized by underutilization of human resources and outmigration of young people." Hearings on Public Works for Power and Energy Research Appropriation Bill, 1977, before a Subcommittee of the House Committee on Appropriations, 94th Cong., 2d Sess., pt. 5, p. 261 (1976). Of particular relevance to this case is one aspect of the project, a dam which TVA determined to place on the Little Tennessee, a short distance from where the river's waters meet with the Big Tennessee. When fully operational, the dam would impound water covering some 16,500 acres—much of which represents valuable and productive farmland—thereby converting the river's shallow, fast-flowing waters into a deep reservoir over 30 miles in length.

The Tellico Dam has never opened, however, despite the fact that construction has been virtually completed and the

[2] See Brief for the Eastern Band of Cherokee Indians as *Amicus Curiae* 2. See also Mooney, Myths of the Cherokee, 19 Bureau of American Ethnology Ann. Rep. 11 (1900); H. Timberlake, Memoirs, 1756–1765 (Watauga Press 1927); A. Brewer & C. Brewer, Valley So Wild: A Folk History (East Tenn. Historical Soc. 1975).

[3] Public Works Appropriation Act, 1967, 80 Stat. 1002, 1014.

[4] Tellico Dam itself will contain no electric generators; however, an interreservoir canal connecting Tellico Reservoir with a nearby hydroelectric plant will augment the latter's capacity.

dam is essentially ready for operation. Although Congress has appropriated monies for Tellico every year since 1967, progress was delayed, and ultimately stopped, by a tangle of lawsuits and administrative proceedings. After unsuccessfully urging TVA to consider alternatives to damming the Little Tennessee, local citizens and national conservation groups brought suit in the District Court, claiming that the project did not conform to the requirements of the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U. S. C. § 4321 *et seq.* After finding TVA to be in violation of NEPA, the District Court enjoined the dam's completion pending the filing of an appropriate environmental impact statement. *Environmental Defense Fund* v. *TVA,* 339 F. Supp. 806 (ED Tenn.), aff'd, 468 F. 2d 1164 (CA6 1972). The injunction remained in effect until late 1973, when the District Court concluded that TVA's final environmental impact statement for Tellico was in compliance with the law. *Environmental Defense Fund* v. *TVA,* 371 F. Supp. 1004 (ED Tenn. 1973), aff'd, 492 F. 2d 466 (CA6 1974).[5]

A few months prior to the District Court's decision dissolving the NEPA injunction, a discovery was made in the waters of the Little Tennessee which would profoundly affect the Tellico Project. Exploring the area around Coytee Springs, which is about seven miles from the mouth of the river, a University of Tennessee ichthyologist, Dr. David A. Etnier, found a previously unknown species of perch, the snail darter, or *Percina (Imostoma) tanasi.*[6] This three-inch, tannish-colored fish,

---

[5] The NEPA injunction was in effect some 21 months; when it was entered TVA had spent some $29 million on the project. Most of these funds have gone to purchase land, construct the concrete portions of the dam, and build a four-lane steel-span bridge to carry a state highway over the proposed reservoir. 339 F. Supp., at 808.

[6] The snail darter was scientifically described by Dr. Etnier in the Proceedings of the Biological Society of Washington, Vol. 88, No. 44, pp. 469–488 (Jan. 22, 1976). The scientific merit and content of Dr. Etnier's

whose numbers are estimated to be in the range of 10,000 to 15,000, would soon engage the attention of environmentalists, the TVA, the Department of the Interior, the Congress of the United States, and ultimately the federal courts, as a new and additional basis to halt construction of the dam.

Until recently the finding of a new species of animal life would hardly generate a cause célèbre. This is particularly so in the case of darters, of which there are approximately 130 known species, 8 to 10 of these having been identified only in the last five years.[7] The moving force behind the snail darter's sudden fame came some four months after its discovery, when the Congress passed the Endangered Species Act of 1973 (Act), 87 Stat. 884, 16 U. S. C. § 1531 *et seq.* (1976 ed.). This legislation, among other things, authorizes the Secretary of the Interior to declare species of animal life "endangered" [8] and to

---

paper on the snail darter were checked by a panel from the Smithsonian Institution prior to publication. See App. 111.

[7] In Tennessee alone there are 85 to 90 species of darters, *id.*, at 131, of which upward to 45 live in the Tennessee River system. *Id.*, at 130. New species of darters are being constantly discovered and classified—at the rate of about one per year. *Id.*, at 131. This is a difficult task for even trained ichthyologists since species of darters are often hard to differentiate from one another. *Ibid.*

[8] An "endangered species" is defined by the Act to mean "any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man." 16 U. S. C. § 1532 (4) (1976 ed.).

" 'The act covers every animal and plant species, subspecies, and population in the world needing protection. There are approximately 1.4 million full species of animals and 600,000 full species of plants in the world. Various authorities calculate as many as 10% of them—some 200,000—may need to be listed as Endangered or Threatened. When one counts in subspecies, not to mention individual populations, the total could increase to three to five times that number.' " Keith Shreiner, Associate Director and Endangered Species Program Manager of the U. S. Fish and Wildlife Service, quoted in a letter from A. J. Wagner, Chairman, TVA, to

identify the "critical habitat" [9] of these creatures. When a species or its habitat is so listed, the following portion of the Act—relevant here—becomes effective:

"The Secretary [of the Interior] shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal departments and agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title and *by taking such action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of such endangered species and threatened species or result in the destruction or modification of habitat of such species* which is determined by the Secretary, after consultation as appropriate with the affected States, to be critical." 16 U. S. C. § 1536 (1976 ed.) (emphasis added).

---

Chairman, House Committee on Merchant Marine and Fisheries, dated Apr. 25, 1977, quoted in Wood, On Protecting an Endangered Statute: The Endangered Species Act of 1973, 37 Federal B. J. 25, 27 (1978).

[9] The Act does not define "critical habitat," but the Secretary of the Interior has administratively construed the term:

" 'Critical habitat' means any air, land, or water area (exclusive of those existing man-made structures or settlements which are not necessary to the survival and recovery of a listed species) and constituent elements thereof, the loss of which would appreciably decrease the likelihood of the survival and recovery of a listed species or a distinct segment of its population. The constituent elements of critical habitat include, but are not limited to: physical structures and topography, biota, climate, human activity, and the quality and chemical content of land, water, and air. Critical habitat may represent any portion of the present habitat of a listed species and may include additional areas for reasonable population expansion." 43 Fed. Reg. 874 (1978) (to be codified as 50 CFR § 402.02).

In January 1975, the respondents in this case[10] and others petitioned the Secretary of the Interior[11] to list the snail darter as an endangered species. After receiving comments from various interested parties, including TVA and the State of Tennessee, the Secretary formally listed the snail darter as an endangered species on October 8, 1975. 40 Fed. Reg. 47505–47506; see 50 CFR § 17.11 (i) (1976). In so acting, it was noted that "the snail darter is a living entity which is genetically distinct and reproductively isolated from other fishes." 40 Fed. Reg. 47505. More important for the purposes of this case, the Secretary determined that the snail darter apparently lives only in that portion of the Little Tennessee River which would be completely inundated by the reservoir created as a consequence of the Tellico Dam's completion. *Id.*, at 47506.[12]

---

[10] Respondents are a regional association of biological scientists, a Tennessee conservation group, and individuals who are citizens or users of the Little Tennessee Valley area which would be affected by the Tellico Project.

[11] The Act authorizes "interested person[s]" to petition the Secretary of the Interior to list a species as endangered. 16 U. S. C. § 1533 (c) (2) (1976 ed.); see 5 U. S. C. § 553 (e) (1976 ed.).

[12] Searches by TVA in more than 60 watercourses have failed to find other populations of snail darters. App. 36, 410–412. The Secretary has noted that "more than 1,000 collections in recent years and additional earlier collections from central and east Tennessee have not revealed the presence of the snail darter outside the Little Tennessee River." 40 Fed. Reg. 47505 (1975). It is estimated, however, that the snail darter's range once extended throughout the upper main Tennessee River and the lower portions of its major tributaries above Chattanooga—all of which are now the sites of dam impoundments. See Hearings on Public Works for Water and Power Development and Energy Research Appropriation Bill, 1978, before a Subcommittee of the House Committee on Appropriations, 95th Cong., 1st Sess., pt. 4, pp. 240–241 (1977) (statement of witness for TVA); Hearings on Endangered Species Act Oversight, before the Subcommittee on Resource Protection of the Senate Committee on Environment and Public Works, 95th Cong., 1st Sess., 291 (1977); App. 139.

The Secretary went on to explain the significance of the dam to the habitat of the snail darter:

> "[T]he snail darter occurs only in the swifter portions of shoals over clean gravel substrate in cool, low-turbidity water. Food of the snail darter is almost exclusively snails which require a clean gravel substrate for their survival. *The proposed impoundment of water behind the proposed Tellico Dam would result in total destruction of the snail darter's habitat." Ibid.* (emphasis added).

Subsequent to this determination, the Secretary declared the area of the Little Tennessee which would be affected by the Tellico Dam to be the "critical habitat" of the snail darter. 41 Fed. Reg. 13926–13928 (1976) (to be codified as 50 CFR § 17.81). Using these determinations as a predicate, and notwithstanding the near completion of the dam, the Secretary declared that pursuant to § 7 of the Act, "all Federal agencies must take such action as is necessary to insure that actions authorized, funded, or carried out by them do not result in the destruction or modification of this critical habitat area." 41 Fed. Reg. 13928 (1976) (to be codified as 50 CFR § 17.81 (b)). This notice, of course, was pointedly directed at TVA and clearly aimed at halting completion or operation of the dam.

During the pendency of these administrative actions, other developments of relevance to the snail darter issue were transpiring. Communication was occurring between the Department of the Interior's Fish and Wildlife Service and TVA with a view toward settling the issue informally. These negotiations were to no avail, however, since TVA consistently took the position that the only available alternative was to attempt relocating the snail darter population to another suitable location. To this end, TVA conducted a search of alternative sites which might sustain the fish, culminating in the experimental transplantation of a number of snail darters to the nearby Hiwassee River. However, the Secretary of the Interior was

not satisfied with the results of these efforts, finding that TVA had presented "little evidence that they have carefully studied the Hiwassee to determine whether or not" there were "biological and other factors in this river that [would] negate a successful transplant."[13]   40 Fed. Reg. 47506 (1975).

Meanwhile, Congress had also become involved in the fate of the snail darter.   Appearing before a Subcommittee of the House Committee on Appropriations in April 1975—some seven months before the snail darter was listed as endangered—TVA representatives described the discovery of the fish and the relevance of the Endangered Species Act to the Tellico Project.   Hearings on Public Works for Water and Power Development and Energy Research Appropriation Bill, 1976, before a Subcommittee of the House Committee on Appropriations, 94th Cong., 1st Sess., pt. 7, pp. 466–467 (1975); Hearings on H. R. 8122, Public Works for Water and Power Development and Energy Research Appropriations for Fiscal Year 1976, before a Subcommittee of the Senate Committee on Appropriations, 94th Cong., 1st Sess., pt. 4, pp. 3775–3777 (1975). At that time TVA presented a position which it would advance in successive forums thereafter, namely, that the Act did not prohibit the completion of a project authorized, funded, and substantially constructed before the Act was passed.   TVA also described its efforts to transplant the snail darter, but contended that the dam should be finished regardless of the

---

[13] The Fish and Wildlife Service and Dr. Etnier have stated that it may take from 5 to 15 years for scientists to determine whether the snail darter can successfully survive and reproduce in this new environment. See General Accounting Office, The Tennessee Valley Authority's Tellico Dam Project—Costs, Alternatives, and Benefits 4 (Oct. 14, 1977).   In expressing doubt over the long-term future of the Hiwassee transplant, the Secretary noted: "That the snail darter does not already inhabit the Hiwassee River, despite the fact that the fish has had access to it in the past, is a strong indication that there may be biological and other factors in this river that negate a successful transplant."   40 Fed. Reg. 47506 (1975).

experiment's success. Thereafter, the House Committee on Appropriations, in its June 20, 1975, Report, stated the following in the course of recommending that an additional $29 million be appropriated for Tellico:

> "The *Committee* directs that the project, for which an environmental impact statement has been completed and provided the Committee, should be completed as promptly as possible . . . ."    H. R. Rep. No. 94–319, p. 76 (1975). (Emphasis added.)

Congress then approved the TVA general budget, which contained funds for continued construction of the Tellico Project.[14] In December 1975, one month after the snail darter was declared an endangered species, the President signed the bill into law.  Public Works for Water and Power Development and Energy Research Appropriation Act, 1976, 89 Stat. 1035, 1047.

In February 1976, pursuant to § 11 (g) of the Endangered Species Act, 87 Stat. 900, 16 U. S. C. § 1540 (g) (1976 ed.),[15] respondents filed the case now under review, seeking to enjoin completion of the dam and impoundment of the reservoir on the ground that those actions would violate the Act by directly causing the extinction of the species *Percina* (*Imostoma*) *tanasi*.  The District Court denied respondents' request for a preliminary injunction and set the matter for trial.  Shortly thereafter the House and Senate held appropriations hearings which would include discussions of the Tellico budget.

---

[14] TVA projects generally are authorized by the Authority itself and are funded—without the need for specific congressional authorization—from lump-sum appropriations provided in yearly budget grants. See 16 U. S. C. §§ 831c (j) and 831z (1976 ed.).

[15] Section 11 (g) allows "any person" to commence a civil action in a United States District Court to, *inter alia,* "enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision" of the Act "or regulation issued under the authority thereof . . . ."

At these hearings, TVA Chairman Wagner reiterated the agency's position that the Act did not apply to a project which was over 50% finished by the time the Act became effective and some 70% to 80% complete when the snail darter was officially listed as endangered. It also notified the Committees of the recently filed lawsuit's status and reported that TVA's efforts to transplant the snail darter had "been very encouraging." Hearings on Public Works for Water and Power Development and Energy Research Appropriation Bill, 1977, before a Subcommittee of the House Committee on Appropriations, 94th Cong., 2d Sess., pt. 5, pp. 261–262 (1976); Hearings on Public Works for Water and Power Development and Energy Research Appropriations for Fiscal Year 1977, before a Subcommittee of the Senate Committee on Appropriations, 94th Cong., 2d Sess., pt. 4, pp. 3096–3099 (1976).

Trial was held in the District Court on April 29 and 30, 1976, and on May 25, 1976, the court entered its memorandum opinion and order denying respondents their requested relief and dismissing the complaint. The District Court found that closure of the dam and the consequent impoundment of the reservoir would "result in the adverse modification, if not complete destruction, of the snail darter's critical habitat," [16]

---

[16] The District Court made the following findings with respect to the dam's effect on the ecology of the snail darter:

"The evidence introduced at trial showed that the snail darter requires for its survival a clear, gravel substrate, in a large-to-medium, flowing river. The snail darter has a fairly high requirement for oxygen and since it tends to exist in the bottom of the river, the flowing water provides the necessary oxygen at greater depths. Reservoirs, unlike flowing rivers, tend to have a low oxygen content at greater depths.

"Reservoirs also tend to have more silt on the bottom than flowing rivers, and this factor, combined with the lower oxygen content, would make it highly probable that snail darter eggs would smother in such an environment. Furthermore, the adult snail darters would probably find this type of reservoir environment unsuitable for spawning.

"Another factor that would tend to make a reservoir habitat unsuitable for snail darters is that their primary source of food, snails, probably

making it "highly probable" that "the continued existence of the snail darter" would be "jeopardize[d]." 419 F. Supp. 753, 757 (ED Tenn.). Despite these findings, the District Court declined to embrace the plaintiffs' position on the merits: that once a federal project was shown to jeopardize an endangered species, a court of equity is compelled to issue an injunction restraining violation of the Endangered Species Act.

In reaching this result, the District Court stressed that the entire project was then about 80% complete and, based on available evidence, "there [were] no alternatives to impoundment of the reservoir, short of scrapping the entire project." *Id.*, at 758. The District Court also found that if the Tellico Project was permanently enjoined, "some $53 million would be lost in nonrecoverable obligations," *id.*, at 759, meaning that a large portion of the $78 million already expended would be wasted. The court also noted that the Endangered Species Act of 1973 was passed some seven years after construction on the dam commenced and that Congress had continued appropriations for Tellico, with full awareness of the snail darter problem. Assessing these various factors, the District Court concluded:

> "At some point in time a federal project becomes so near completion and so incapable of modification that a court of equity should not apply a statute enacted long after inception of the project to produce an unreasonable result. . . . Where there has been an irreversible and irretrievable commitment of resources by Congress to a project over a span of almost a decade, the Court should proceed with a great deal of circumspection." *Id.*, at 760.

To accept the plaintiffs' position, the District Court argued, would inexorably lead to what it characterized as the absurd result of requiring "a court to halt impoundment of water

would not survive in such an environment." 419 F. Supp. 753, 756 (ED Tenn. 1976).

behind a fully completed dam if an endangered species were discovered in the river on the day before such impoundment was scheduled to take place. We cannot conceive that Congress intended such a result." *Id.*, at 763.

Less than a month after the District Court decision, the Senate and House Appropriations Committees recommended the full budget request of $9 million for continued work on Tellico. See S. Rep. No. 94–960, p. 96 (1976); H. R. Rep. No. 94–1223, p. 83 (1976). In its Report accompanying the appropriations bill, the Senate Committee stated:

> "During subcommittee hearings, TVA was questioned about the relationship between the Tellico project's completion and the November 1975 listing of the snail darter (a small 3-inch fish which was discovered in 1973) as an endangered species under the Endangered Species Act. TVA informed the Committee that it was continuing its efforts to preserve the darter, while working towards the scheduled 1977 completion date. TVA repeated its view that the Endangered Species Act did not prevent the completion of the Tellico project, which has been under construction for nearly a decade. The subcommittee brought this matter, as well as the recent U. S. District Court's decision upholding TVA's decision to complete the project, to the attention of the full Committee. *The Committee does not view* the Endangered Species Act as prohibiting the completion of the Tellico project at its advanced stage and directs that this project be completed as promptly as possible in the public interest." S. Rep. No. 94–960, *supra,* at 96. (Emphasis added.)

On June 29, 1976, both Houses of Congress passed TVA's general budget, which included funds for Tellico; the President signed the bill on July 12, 1976. Public Works for Water and Power Development and Energy Research Appropriation Act, 1977, 90 Stat. 889, 899.

Thereafter, in the Court of Appeals, respondents argued that the District Court had abused its discretion by not issuing an injunction in the face of "a blatant statutory violation." 549 F. 2d 1064, 1069 (CA6 1977). The Court of Appeals agreed, and on January 31, 1977, it reversed, remanding "with instructions that a permanent injunction issue halting all activities incident to the Tellico Project which may destroy or modify the critical habitat of the snail darter." *Id.*, at 1075. The Court of Appeals directed that the injunction "remain in effect until Congress, by appropriate legislation, exempts Tellico from compliance with the Act or the snail darter has been deleted from the list of endangered species or its critical habitat materially redefined." *Ibid.*

The Court of Appeals accepted the District Court's finding that closure of the dam would result in the known population of snail darters being "significantly reduced if not completely extirpated." *Id.*, at 1069. TVA, in fact, had conceded as much in the Court of Appeals, but argued that "closure of the Tellico Dam, as the last stage of a ten-year project, falls outside the legitimate purview of the Act if it is rationally construed." *Id.*, at 1070. Disagreeing, the Court of Appeals held that the record revealed a prima facie violation of § 7 of the Act, namely that TVA had failed to take "such action . . . necessary to insure" that its "actions" did not jeopardize the snail darter or its critical habitat.

The reviewing court thus rejected TVA's contention that the word "actions" in § 7 of the Act was not intended by Congress to encompass the terminal phases of ongoing projects. Not only could the court find no "positive reinforcement" for TVA's argument in the Act's legislative history, but also such an interpretation was seen as being "inimical to . . . its objectives." 549 F. 2d, at 1070. By way of illustration, that court pointed out that "the detrimental impact of a project upon an endangered species may not always be clearly perceived before construction is well underway." *Id.*, at 1071. Given such a

likelihood, the Court of Appeals was of the opinion that TVA's position would require the District Court, sitting as a chancellor, to balance the worth of an endangered species against the value of an ongoing public works measure, a result which the appellate court was not willing to accept. Emphasizing the limits on judicial power in this setting, the court stated:

"Current project status cannot be translated into a workable standard of judicial review. Whether a dam is 50% or 90% completed is irrelevant in calculating the social and scientific costs attributable to the disappearance of a unique form of life. Courts are ill-equipped to calculate how many dollars must be invested before the value of a dam exceeds that of the endangered species. Our responsibility under § 1540 (g)(1)(A) is merely to preserve the status quo where endangered species are threatened, thereby guaranteeing the legislative or executive branches sufficient opportunity to grapple with the alternatives." *Ibid.*

As far as the Court of Appeals was concerned, it made no difference that Congress had repeatedly approved appropriations for Tellico, referring to such legislative approval as an "advisory opinio[n]" concerning the proper application of an existing statute. In that court's view, the only relevant legislation was the Act itself, "[t]he meaning and spirit" of which was "clear on its face." *Id.,* at 1072.

Turning to the question of an appropriate remedy, the Court of Appeals ruled that the District Court had erred by not issuing an injunction. While recognizing the irretrievable loss of millions of dollars of public funds which would accompany injunctive relief, the court nonetheless decided that the Act explicitly commanded precisely that result:

"It is conceivable that the welfare of an endangered species may weigh more heavily upon the public conscience, as expressed by the final will of Congress, than the writeoff of those millions of dollars already expended

for Tellico in excess of its present salvageable value."
*Id.,* at 1074.

Following the issuance of the permanent injunction, members of TVA's Board of Directors appeared before Subcommittees of the House and Senate Appropriations Committees to testify in support of continued appropriations for Tellico. The Subcommittees were apprised of all aspects of Tellico's status, including the Court of Appeals' decision. TVA reported that the dam stood "ready for the gates to be closed and the reservoir filled," Hearings on Public Works for Water and Power Development and Energy Research Appropriation Bill, 1978, before a Subcommittee of the House Committee on . Appropriations, 95th Cong., 1st Sess., pt. 4, p. 234 (1977), and requested funds for completion of certain ancillary parts of the project, such as public use areas, roads, and bridges. As to the snail darter itself, TVA commented optimistically on its transplantation efforts, expressing the opinion that the relocated fish were "doing well and ha[d] reproduced." *Id.,* at 235, 261–262.

Both Appropriations Committees subsequently recommended the full amount requested for completion of the Tellico Project. In its June 2, 1977, Report, the House Appropriations Committee stated:

> "It is *the Committee's view* that the Endangered Species Act was not intended to halt projects such as these in their advanced stage of completion, and [the Committee] strongly recommends that these projects not be stopped because of misuse of the Act." H. R. Rep. No. 95–379, p. 104. (Emphasis added.)

As a solution to the problem, the House Committee advised that TVA should cooperate with the Department of the Interior "to relocate the endangered species to another suitable habitat so as to permit the project to proceed as rapidly as possible." *Id.,* at 11. Toward this end, the Committee recom-

mended a special appropriation of $2 million to facilitate relocation of the snail darter and other endangered species which threatened to delay or stop TVA projects. Much the same occurred on the Senate side, with its Appropriations Committee recommending both the amount requested to complete Tellico and the special appropriation for transplantation of endangered species. Reporting to the Senate on these measures, the Appropriations Committee took a particularly strong stand on the snail darter issue:

> "This *committee has not viewed* the Endangered Species Act as preventing the completion and use of these projects which were well under way at the time the affected species were listed as endangered. If the act has such an effect, which is contrary to *the Committee's understanding* of the intent of Congress in enacting the Endangered Species Act, funds should be appropriated to allow these projects to be completed and their benefits realized in the public interest, the Endangered Species Act notwithstanding." S. Rep. No. 95–301, p. 99 (1977). (Emphasis added.)

TVA's budget, including funds for completion of Tellico and relocation of the snail darter, passed both Houses of Congress and was signed into law on August 7, 1977. Public Works for Water and Power Development and Energy Research Appropriation Act, 1978, 91 Stat. 797.

We granted certiorari, 434 U. S. 954 (1977), to review the judgment of the Court of Appeals.

## II

We begin with the premise that operation of the Tellico Dam will either eradicate the known population of snail darters or destroy their critical habitat. Petitioner does not now seriously dispute this fact.[17] In any event, under § 4 (a)(1)

---

[17] The District Court findings are to the same effect and are unchallenged here.

of the Act, 87 Stat. 886, 16 U. S. C. § 1533 (a)(1) (1976 ed.), the Secretary of the Interior is vested with exclusive authority to determine whether a species such as the snail darter is "endangered" or "threatened" and to ascertain the factors which have led to such a precarious existence. By § 4 (d) Congress has authorized—indeed commanded—the Secretary to "issue such regulations as he deems necessary and advisable to provide for the conservation of such species." 16 U. S. C. § 1533 (d) (1976 ed.). As we have seen, the Secretary promulgated regulations which declared the snail darter an endangered species whose critical habitat would be destroyed by creation of the Tellico Reservoir. Doubtless petitioner would prefer not to have these regulations on the books, but there is no suggestion that the Secretary exceeded his authority or abused his discretion in issuing the regulations. Indeed, no judicial review of the Secretary's determinations has ever been sought and hence the validity of his actions are not open to review in this Court.

Starting from the above premise, two questions are presented: (a) would TVA be in violation of the Act if it completed and operated the Tellico Dam as planned? (b) if TVA's actions would offend the Act, is an injunction the appropriate remedy for the violation? For the reasons stated hereinafter, we hold that both questions must be answered in the affirmative.

(A)

It may seem curious to some that the survival of a relatively small number of three-inch fish among all the countless millions of species extant would require the permanent halting of a virtually completed dam for which Congress has expended more than $100 million. The paradox is not minimized by the fact that Congress continued to appropriate large sums of public money for the project, even after congressional Appropriations Committees were apprised of its apparent impact upon the survival of the snail darter. We conclude,

however, that the explicit provisions of the Endangered Species Act require precisely that result.

One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies "to *insure* that actions *authorized, funded,* or *carried out* by them do not *jeopardize* the continued existence" of an endangered species or *"result* in the destruction or modification of habitat of such species . . . ." 16 U. S. C. § 1536 (1976 ed.). (Emphasis added.) This language admits of no exception. Nonetheless, petitioner urges, as do the dissenters, that the Act cannot reasonably be interpreted as applying to a federal project which was well under way when Congress passed the Endangered Species Act of 1973. To sustain that position, however, we would be forced to ignore the ordinary meaning of plain language. It has not been shown, for example, how TVA can close the gates of the Tellico Dam without "carrying out" an action that has been "authorized" and "funded" by a federal agency. Nor can we understand how such action will *"insure"* that the snail darter's habitat is not disrupted.[18] Accepting the Secretary's determinations, as

---

[18] In dissent, MR. JUSTICE POWELL argues that the meaning of "actions" in § 7 is "far from 'plain,' " and that "it seems evident that the 'actions' referred to are not all actions that an agency can ever take, but rather actions that the agency is *deciding whether* to authorize, to fund, or to carry out." *Post,* at 205. Aside from this bare assertion, however, no explanation is given to support the proffered interpretation. This recalls Lewis Carroll's classic advice on the construction of language:

" 'When *I* use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what *I* choose it to mean—neither more nor less.' " Through the Looking Glass, in The Complete Works of Lewis Carroll 196 (1939).

Aside from being unexplicated, the dissent's reading of § 7 is flawed on several counts. First, under its view, the words "or carry out" in § 7 would be superfluous since all prospective actions of an agency remain to be "authorized" or "funded." Second, the dissent's position logically means that an agency would be obligated to comply with § 7 only when a project is in the planning stage. But if Congress had meant to so limit the Act, it

we must, it is clear that TVA's proposed operation of the dam will have precisely the opposite effect, namely the *eradication* of an endangered species.

Concededly, this view of the Act will produce results requiring the sacrifice of the anticipated benefits of the project and of many millions of dollars in public funds.[19] But examination of the language, history, and structure of the legislation under review here indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities.

When Congress passed the Act in 1973, it was not legislating on a clean slate. The first major congressional concern for the preservation of the endangered species had come with passage of the Endangered Species Act of 1966, 80 Stat. 926, repealed, 87 Stat. 903.[20] In that legislation Congress gave the

surely would have used words to that effect, as it did in the National Environmental Policy Act, 42 U. S. C. §§ 4332 (2) (A), (C).

[19] The District Court determined that failure to complete the Tellico Dam would result in the loss of some $53 million in nonrecoverable obligations; see *supra*, at 166. Respondents dispute this figure, and point to a recent study by the General Accounting Office, which suggests that the figure could be considerably less. See GAO Study, n. 13, *supra*, at 5–14; see also Cook, Cook, & Gove, The Snail Darter & the Dam, 51 National Parks & Conservation Magazine 10 (1977); Conservation Foundation Letter 1–2 (Apr. 1978). The GAO study also concludes that TVA and Congress should explore alternatives to impoundment of the reservoir, such as the creation of a regional development program based on a free-flowing river. None of these considerations are relevant to our decision, however; they are properly addressed to the Executive and Congress.

[20] Prior federal involvement with endangered species had been quite limited. For example, the Lacey Act of 1900, 31 Stat. 187, partially codified in 16 U. S. C. §§ 667e and 701 (1976 ed.), and the Black Bass Act of 1926, 44 Stat. 576, as amended, 16 U. S. C. § 851 *et seq.* (1976 ed.), prohibited the transportation in interstate commerce of fish or wildlife taken in violation of national, state, or foreign law. The effect of both of these statutes was constrained, however, by the fact that prior to passage of the Endangered Species Act of 1973, there were few laws regulating these

Secretary power to identify "the names of the species of native fish and wildlife found to be threatened with extinction," § 1 (c), 80 Stat. 926, as well as authorization to purchase land for the conservation, protection, restoration, and propagation of "selected species" of "native fish and wildlife" threatened with extinction. §§ 2 (a)–(c), 80 Stat. 926–927. Declaring the preservation of endangered species a national policy, the 1966 Act directed all federal agencies both to protect these species and *"insofar as is practicable and consistent with the[ir] primary purposes,"* § 1 (b), 80 Stat. 926, "preserve the habitats of such threatened species on lands under their jurisdiction." *Ibid.* (Emphasis added.) The 1966 statute was not a sweeping prohibition on the taking of endangered species, however, except on federal lands, § 4 (c), 80 Stat. 928, and even in those federal areas the Secretary was authorized to allow the hunting and fishing of endangered species. § 4 (d)(1), 80 Stat. 928.

In 1969 Congress enacted the Endangered Species Conservation Act, 83 Stat. 275, repealed, 87 Stat. 903, which continued the provisions of the 1966 Act while at the same time broadening federal involvement in the preservation of endangered species. Under the 1969 legislation, the Secretary was empowered to list species "threatened with worldwide extinction," § 3 (a), 83 Stat. 275; in addition, the importation of any species so recognized into the United States was prohibited. § 2, 83 Stat. 275. An indirect approach to the taking of

creatures. See Coggins, Conserving Wildlife Resources: An Overview of the Endangered Species Act of 1973, 51 N. D. L. Rev. 315, 317–318 (1975). The Migratory Bird Treaty Act, passed in 1918, 40 Stat. 755, as amended, 16 U. S. C. § 703 *et seq.* (1976 ed.), was more extensive, giving the Secretary of the Interior power to adopt regulations for the protection of migratory birds. Other measures concentrated on establishing refuges for wildlife. See, *e. g.,* Land and Water Conservation Fund Act of 1965, 78 Stat. 897, 16 U. S. C. § 460*l*–4 *et seq.* (1976 ed.). See generally Environmental Law Institute, The Evolution of National Wildlife Law (1977).

endangered species was also adopted in the Conservation Act by way of a ban on the transportation and sale of wildlife taken in violation of any federal, state, or foreign law. §§ 7 (a)-(b), 83 Stat. 279.[21]

Despite the fact that the 1966 and 1969 legislation represented "the most comprehensive of its type to be enacted by any nation"[22] up to that time, Congress was soon persuaded that a more expansive approach was needed if the newly declared national policy of preserving endangered species was to be realized. By 1973, when Congress held hearings on what would later become the Endangered Species Act of 1973, it was informed that species were still being lost at the rate of about one per year, 1973 House Hearings 306 (statement of Stephen R. Seater, for Defenders of Wildlife), and "the pace of disappearance of species" appeared to be "accelerating." H. R. Rep. No. 93-412, p. 4 (1973). Moreover, Congress was also told that the primary cause of this trend was something other than the normal process of natural selection:

> "[M]an and his technology has [sic] continued at an ever-increasing rate to disrupt the natural ecosystem. This has resulted in a dramatic rise in the number and severity of the threats faced by the world's wildlife. The truth in this is apparent when one realizes that half of the recorded extinctions of mammals over the past 2,000 years have occurred in the most recent 50-year period." 1973 House Hearings 202 (statement of Assistant Secretary of the Interior).

[21] This approach to the problem of taking, of course, contained the same inherent limitations as the Lacey and Black Bass Acts, discussed, n. 20, *supra.*

[22] Hearings on Endangered Species before the Subcommittee of the House Committee on Merchant Marine and Fisheries, 93d Cong., 1st Sess., 202 (1973) (statement of Assistant Secretary of the Interior) (hereinafter cited as 1973 House Hearings).

That Congress did not view these developments lightly was stressed by one commentator:

> "The dominant theme pervading all Congressional discussion of the proposed [Endangered Species Act of 1973] was the overriding need *to devote whatever effort and resources were necessary* to avoid further diminution of national and worldwide wildlife resources. Much of the testimony at the hearings and much debate was devoted to the biological problem of extinction. Senators and Congressmen uniformly deplored the irreplaceable loss to aesthetics, science, ecology, and the national heritage should more species disappear." Coggins, Conserving Wildlife Resources: An Overview of the Endangered Species Act of 1973, 51 N. D. L. Rev. 315, 321 (1975). (Emphasis added.)

The legislative proceedings in 1973 are, in fact, replete with expressions of concern over the risk that might lie in the loss of *any* endangered species.[23] Typifying these sentiments is the Report of the House Committee on Merchant Marine and

---

[23] See, *e. g.*, 1973 House Hearings 280 (statement of Rep. Roe); *id.*, at 281 (statement of Rep. Whitehurst); *id.*, at 301 (statement of Friends of the Earth); *id.*, at 306–307 (statement of Defenders of Wildlife). One statement, made by the Assistant Secretary of the Interior, particularly deserves notice:

"I have watched in my lifetime a vast array of mollusks in southern streams totally disappear as a result of damming, channelization, and pollution. It is often asked of me, 'what is the importance of the mollusks for example in Alabama.' I do not know, and I do not know whether any of us will ever have the insight to know exactly why these mollusks evolved over millions of years or what their importance is in the total ecosystem. However, I have great trouble being party to their destruction without ever having gained such knowledge." *Id.*, at 207.

One member of the mollusk family existing in these southern rivers is the snail, see 12 Encyclopedia Britannica 326 (15th ed. 1974), which ironically enough provides the principal food for snail darters. See *supra*, at 162, 165–166, n. 16.

Fisheries on H. R. 37, a bill which contained the essential features of the subsequently enacted Act of 1973; in explaining the need for the legislation, the Report stated:

> "As we homogenize the habitats in which these plants and animals evolved, and as we increase the pressure for products that they are in a position to supply (usually unwillingly) we threaten their—and our own—genetic heritage.
>
> *"The value of this genetic heritage is, quite literally, incalculable.*
>
> .        .        .        .        .
>
> "From the most narrow possible point of view, *it is in the best interests of mankind to minimize the losses of genetic variations.* The reason is simple: they are potential resources. They are keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask.
>
> "To take a homely, but apt, example: one of the critical chemicals in the regulation of ovulations in humans was found in a common plant. Once discovered, and analyzed, humans could duplicate it synthetically, but had it never existed—or had it been driven out of existence before we knew its potentialities—we would never have tried to synthesize it in the first place.
>
> "Who knows, or can say, what potential cures for cancer or other scourges, present or future, may lie locked up in the structures of plants which may yet be undiscovered, much less analyzed? . . . Sheer self-interest impels us to be cautious.
>
> *"The institutionalization of that caution* lies at the heart of H. R. 37 . . . ." H. R. Rep. No. 93–412, pp. 4–5 (1973). (Emphasis added.)

As the examples cited here demonstrate, Congress was concerned about the *unknown* uses that endangered species might

have and about the *unforeseeable* place such creatures may have in the chain of life on this planet.

In shaping legislation to deal with the problem thus presented, Congress started from the finding that "[t]he two major causes of extinction are hunting and destruction of natural habitat." S. Rep. No. 93–307, p. 2 (1973). Of these twin threats, Congress was informed that the greatest was destruction of natural habitats; see 1973 House Hearings 236 (statement of Associate Deputy Chief for National Forest System, Dept. of Agriculture); *id.*, at 241 (statement of Director of Mich. Dept. of Natural Resources); *id.*, at 306 (statement of Stephen R. Seater, Defenders of Wildlife); Lachenmeier, The Endangered Species Act of 1973: Preservation or Pandemonium?, 5 Environ. Law 29, 31 (1974). Witnesses recommended, among other things, that Congress require all land-managing agencies "to avoid damaging critical habitat for endangered species and to take positive steps to improve such habitat." 1973 House Hearings 241 (statement of Director of Mich. Dept. of Natural Resources). Virtually every bill introduced in Congress during the 1973 session responded to this concern by incorporating language similar, if not identical, to that found in the present § 7 of the Act.[24] These provisions were designed, in the words of an administration witness, "for the first time [to] *prohibit* [a] federal agency from taking action which does jeopardize the status of endangered species," Hearings on S. 1592 and S. 1983 before the Subcommittee on Environment of the Senate Committee on Commerce, 93d Cong., 1st Sess., 68 (1973) (statement of

---

[24] For provisions in the House bills, see § 5 (d) of H. R. 37, 470, 471, 1511, 2669, 3696, and 3795; § 3 (d) of H. R. 1461 and 4755; § 5 (d) of H. R. 2735; § 3 (d) of H. R. 4758. For provisions in the Senate bills, see § 3 (d) of S. 1592; § 5 (d) of S. 1983. The House bills are collected in 1973 House Hearings 87–185; the Senate bills are found in the Hearings on S. 1592 and S. 1983 before the Subcommittee on Environment of the Senate Committee on Commerce, 93d Cong., 1st Sess., 3–49 (1973).

Deputy Assistant Secretary of the Interior) (emphasis added);
furthermore, the proposed bills would *"direc[t]* all . . . Federal
agencies to utilize their authorities for carrying out programs
*for the protection* of endangered animals." 1973 House Hear-
ings 205 (statement of Assistant Secretary of the Interior).
(Emphasis added.)

As it was finally passed, the Endangered Species Act of 1973
represented the most comprehensive legislation for the preser-
vation of endangered species ever enacted by any nation. Its
stated purposes were "to provide a means whereby the eco-
systems upon which endangered species and threatened species
depend may be conserved," and "to provide a program for the
conservation of such . . . species . . . ." 16 U. S. C. § 1531 (b)
(1976 ed.). In furtherance of these goals, Congress expressly
stated in § 2 (c) that "all Federal departments and agencies
*shall* seek *to conserve endangered species* and threatened
species . . . ." 16 U. S. C. § 1531 (c) (1976 ed.). (Emphasis
added.) Lest there be any ambiguity as to the meaning of
this statutory directive, the Act specifically defined "conserve"
as meaning "to use and the use of *all methods and procedures
which are necessary* to bring *any endangered species* or threat-
ened species to the point at which the measures provided
pursuant to this chapter are no longer necessary." § 1532 (2).
(Emphasis added.) Aside from § 7, other provisions indicated
the seriousness with which Congress viewed this issue: Virtu-
ally all dealings with endangered species, including taking,
possession, transportation, and sale, were prohibited, 16 U. S. C.
§ 1538 (1976 ed.), except in extremely narrow circumstances,
see § 1539 (b). The Secretary was also given extensive power
to develop regulations and programs for the preservation of
endangered and threatened species.[25] § 1533 (d). Citizen

_____

[25] A further indication of the comprehensive scope of the 1973 Act lies
in Congress' inclusion of "threatened species" as a class deserving federal
protection. Threatened species are defined as those which are "likely to
become an endangered species within the foreseeable future throughout all

involvement was encouraged by the Act, with provisions allowing interested persons to petition the Secretary to list a species as endangered or threatened, § 1533 (c)(2), see n. 11, *supra,* and bring civil suits in United States district courts to force compliance with any provision of the Act, §§ 1540 (c) and (g).

Section 7 of the Act, which of course is relied upon by respondents in this case, provides a particularly good gauge of congressional intent. As we have seen, this provision had its genesis in the Endangered Species Act of 1966, but that legislation qualified the obligation of federal agencies by stating that they should seek to preserve endangered species only *"insofar as is practicable and consistent with the[ir] primary purposes . . . ."* Likewise, every bill introduced in 1973 contained a qualification similar to that found in the earlier statutes.[26] Exemplary of these was the administration bill, H. R. 4758, which in § 2 (b) would direct federal agencies to use their authorities to further the ends of the Act *"insofar as is practicable and consistent with the[ir] primary purposes . . . ."* (Emphasis added.) Explaining the idea behind this language, an administration spokesman told Congress that it "would further signal to all . . . agencies of the Government that this is the *first priority, consistent with their primary objectives."* 1973 House Hearings 213 (statement of Deputy Assistant Secretary of the Interior). (Emphasis added.) This type of language did not go unnoticed by those advocating strong endangered species legislation. A representative of the

---

or a significant portion of [their] range." 16 U. S. C. § 1532 (15) (1976 ed.).

[26] For provisions in the House bills, see §§ 2 (c) and 5 (d) of H. R. 37, 470, 471, 1511, 2669, 3310, 3696, and 3795; § 3 (d) of H. R. 1461 and 4755; § 5 (d) of H. R. 2735; § 2 (b) of H. R. 4758; one other House bill, H. R. 2169, imposed no requirements on federal agencies. For provisions in the Senate bills, see § 2 (b) of S. 1592; §§ 2 (b), and 5 (d) of S. 1983.

Sierra Club, for example, attacked the use of the phrase "consistent with the primary purpose" in proposed H. R. 4758, cautioning that the qualification "could be construed to be a declaration of congressional policy that other agency purposes are necessarily more important than protection of endangered species and would always prevail if conflict were to occur." 1973 House Hearings 335 (statement of the chairman of the Sierra Club's National Wildlife Committee); see *id.*, at 251 (statement for the National Audubon Society).

What is very significant in this sequence is that the final version of the 1973 Act carefully omitted all of the reservations described above. In the bill which the Senate initially approved (S. 1983), however, the version of the current § 7 merely required federal agencies to "carry out such programs *as are practicable* for the protection of species listed . . . ."[27] S. 1983, § 7 (a). (Emphasis added.) By way of contrast, the bill that originally passed the House, H. R. 37, contained a provision which was essentially a mirror image of the subsequently passed § 7—indeed all phrases which might have qualified an agency's responsibilities had been omitted from the bill.[28] In explaining the expected impact of this provision in H. R. 37 on federal agencies, the House Committee's Report states:

> "This subsection *requires* the Secretary and the heads of all other Federal departments and agencies to use their authorities in order to carry out programs for the pro-

---

[27] We note, however, that in the version of S. 1983 which was sent to the floor of the Senate by the Senate Committee on Commerce, the qualifying language "wherever practicable" had been omitted from one part of the bill, that being § 2 (b). See 119 Cong. Rec. 25663 (1973). Section 2 (b) was the portion of S. 1983 that stated the "purposes and policy" of Congress. But the Committee's version of S. 1983—which was reported to the full Senate—retained the limitation on § 7 that we note here. 119 Cong. Rec. 25664 (1973).

[28] See *id.*, at 30157–30162.

tection of endangered species, and it further *requires* that those agencies take *the necessary action* that will *not jeopardize* the continuing existence of endangered species or result in the destruction of critical habitat of those species." H. R. Rep. No. 93–412, p. 14 (1973). (Emphasis added.)

Resolution of this difference in statutory language, as well as other variations between the House and Senate bills, was the task of a Conference Committee. See 119 Cong. Rec. 30174–30175, 31183 (1973). The Conference Report, H. R. Conf. Rep. No. 93–740 (1973), basically adopted the Senate bill, S. 1983; but the conferees rejected the Senate version of § 7 and adopted the stringent, mandatory language in H. R. 37. While the Conference Report made no specific reference to this choice of provisions, the House manager of the bill, Representative Dingell, provided an interpretation of what the Conference bill would require, making it clear that the mandatory provisions of § 7 were not casually or inadvertently included:

"[Section 7] substantially amplifie[s] the obligation of [federal agencies] to take steps within their power to carry out the purposes of this act. A recent article . . . illustrates the problem which might occur absent this new language in the bill. It appears that the whooping cranes of this country, perhaps the best known of our endangered species, are being threatened by Air Force bombing activities along the gulf coast of Texas. Under existing law, the Secretary of Defense has some discretion as to whether or not he will take the necessary action to see that this threat disappears . . . . [O]nce the bill is enacted, [the Secretary of Defense] *would be required to take the proper steps.* . . .

"Another example . . . [has] to do with the continental population of grizzly bears which may or may not be endangered, but which is surely threatened. . . . Once this

bill is enacted, the appropriate Secretary, whether of
Interior, Agriculture or whatever, *will have to take action*
to see that this situation is not permitted to worsen, and
that these bears are not driven to extinction. The pur-
poses of the bill included the conservation of the species
and of the ecosystems upon which they depend, and
*every agency of government is committed* to see that those
purposes are carried out. . . . [T]he agencies of Gov-
ernment can no longer plead that they can do nothing
about it. *They can, and they must. The law is clear.*"
119 Cong. Rec. 42913 (1973). (Emphasis added.)

It is against this legislative background [29] that we must
measure TVA's claim that the Act was not intended to stop
operation of a project which, like Tellico Dam, was near com-
pletion when an endangered species was discovered in its
path. While there is no discussion in the legislative history
of precisely this problem, the totality of congressional action
makes it abundantly clear that the result we reach today is
wholly in accord with both the words of the statute and the
intent of Congress. The plain intent of Congress in enacting
this statute was to halt and reverse the trend toward species
extinction, whatever the cost. This is reflected not only in
the stated policies of the Act, but in literally every section
of the statute. All persons, including federal agencies, are
specifically instructed not to "take" endangered species, mean-
ing that no one is "to harass, harm,[30] pursue, hunt, shoot,

---

[29] When confronted with a statute which is plain and unambiguous on
its face, we ordinarily do not look to legislative history as a guide to its
meaning. *Ex parte Collett*, 337 U. S. 55, 61 (1949), and cases cited
therein. Here it is not *necessary* to look beyond the words of the statute.
We have undertaken such an analysis only to meet MR. JUSTICE POWELL's
suggestion that the "absurd" result reached in this case, *post*, at 196, is
not in accord with congressional intent.

[30] We do not understand how TVA intends to operate Tellico Dam
without "harming" the snail darter. The Secretary of the Interior has
defined the term "harm" to mean "an act or omission which actually

wound, kill, trap, capture, or collect" such life forms. 16 U. S. C. §§ 1532 (14), 1538 (a)(1)(B) (1976 ed.). Agencies in particular are directed by §§ 2 (c) and 3 (2) of the Act to "use . . . *all methods* and procedures which are necessary" to preserve endangered species. 16 U. S. C. §§ 1531 (c), 1532 (2) (1976 ed.) (emphasis added). In addition, the legislative history undergirding § 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species. The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the "primary missions" of federal agencies.

It is not for us to speculate, much less act, on whether Congress would have altered its stance had the specific events of this case been anticipated. In any event, we discern no hint in the deliberations of Congress relating to the 1973 Act that would compel a different result than we reach here.[31]

---

injures or kills wildlife, including acts which annoy it to such an extent as to significantly disrupt essential behavioral patterns, which include, but are not limited to, breeding, feeding or sheltering; *significant environmental modification or degradation which has such effects is included within the meaning of 'harm.'* " 50 CFR § 17.3 (1976) (emphasis added); see S. Rep. No. 93–307, p. 7 (1973).

[31] The *only* portion of the legislative history which petitioner cites as being favorable to its position consists of certain statements made by Senator Tunney on the floor of the Senate during debates on S. 1983; see 119 Cong. Rec. 25691–25692 (1973). Senator Tunney was asked whether the proposed bill would affect the Army Corps of Engineers' decision to build a road through a particular area of Kentucky. Responding to this question, Senator Tunney opined that § 7 of S. 1983 would require consultation among the agencies involved, but that the Corps of Engineers "would not be prohibited from building such a road if they deemed it necessary to do so." 119 Cong. Rec. 25689 (1973). Petitioner interprets these remarks to mean that an agency, after balancing the respective interests involved, could decide to take action which would extirpate an endangered species. If that is what Senator Tunney meant, his views are in distinct

Indeed, the repeated expressions of congressional concern over what it saw as the potentially enormous danger presented by the eradication of *any* endangered species suggest how the balance would have been struck had the issue been presented to Congress in 1973.

Furthermore, it is clear Congress foresaw that § 7 would, on occasion, require agencies to alter ongoing projects in order to fulfill the goals of the Act.[32] Congressman Dingell's discussion of Air Force practice bombing, for instance, obviously pinpoints a particular activity—intimately related to

---

contrast to every other expression in the legislative history as to the meaning of § 7. For example, when the Kentucky example was brought up in the Senate hearings, an administration spokesman interpreted an analogous provision in S. 1592 as "prohibit[ing] [a] federal agency from taking action which does jeopardize the status of endangered species." *Supra,* at 179. Moreover, we note that the version of S. 1983 being discussed by Senator Tunney contained the "as practicable" limitation in § 7 (a) which we have previously mentioned. See *supra,* at 182. Senator Tunney's remarks perhaps explain why the Conference Committee subsequently deleted all such qualifying expressions. We construe the Senator's remarks as simply meaning that under the 1973 Act the agency responsible for the project would have the "final decision," 119 Cong. Rec. 25690 (1973), as to whether the action should proceed, notwithstanding contrary advice from the Secretary of the Interior. The Secretary's recourse would be to either appeal to higher authority in the administration, or proceed to federal court under the relevant provisions of the Act; citizens may likewise seek enforcement under 16 U. S. C. § 1540 (g) (1976 ed.), as has been done in this case.

[32] MR. JUSTICE POWELL characterizes the result reached here as giving "retroactive" effect to the Endangered Species Act of 1973. We cannot accept that contention. Our holding merely gives effect to the plain words of the statute, namely, that § 7 affects all projects which remain to be authorized, funded, or carried out. Indeed, under the Act there could be no "retroactive" application since, by definition, any *prior* action of a federal agency which *would* have come under the scope of the Act must have already *resulted* in the destruction of an endangered species or its critical habitat. In that circumstance the species would have already been extirpated or its habitat destroyed; the Act would then have no subject matter to which it might apply.

the national defense—which a major federal department would be obliged to alter in deference to the strictures of § 7. A similar example is provided by the House Committee Report:

> "Under the authority of [§ 7], the Director of the Park Service would be required *to conform the practices of his agency* to the need for protecting the rapidly dwindling stock of grizzly bears within Yellowstone Park. These bears, which may be endangered, and are undeniably threatened, should at least be protected by supplying them with carcasses from excess elk within the park, *by curtailing the destruction of habitat by clearcutting National Forests surrounding the Park,* and by preventing hunting until their numbers have recovered sufficiently to withstand these pressures." H. R. Rep. No. 93–412, p. 14 (1973). (Emphasis added.)

One might dispute the applicability of these examples to the Tellico Dam by saying that in this case the burden on the public through the loss of millions of unrecoverable dollars would greatly outweigh the loss of the snail darter.[33] But neither the Endangered Species Act nor Art. III of the Constitution provides federal courts with authority to make such fine utilitarian calculations. On the contrary, the plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as "incalculable." Quite obviously, it would be difficult for

---

[33] MR. JUSTICE POWELL's dissent places great reliance on *Church of the Holy Trinity* v. *United States,* 143 U. S. 457, 459 (1892), *post,* at 204, to support his view of the 1973 Act's legislative history. This Court, however, later explained *Holy Trinity* as applying only in "rare and exceptional circumstances. . . . And there must be something to make plain the intent of Congress that the letter of the statute is not to prevail." *Crooks* v. *Harrelson,* 282 U. S. 55, 60 (1930). As we have seen from our explication of the structure and history of the 1973 Act, there is nothing to support the assertion that the literal meaning of § 7 should not apply in this case.

a court to balance the loss of a sum certain—even $100 million—against a congressionally declared "incalculable" value, even assuming we had the power to engage in such a weighing process, which we emphatically do not.

In passing the Endangered Species Act of 1973, Congress was also aware of certain instances in which exceptions to the statute's broad sweep would be necessary. Thus, § 10, 16 U. S. C. § 1539 (1976 ed.), creates a number of limited "hardship exemptions," none of which would even remotely apply to the Tellico Project. In fact, there are no exemptions in the Endangered Species Act for federal agencies, meaning that under the maxim *expressio unius est exclusio alterius,* we must presume that these were the only "hardship cases" Congress intended to exempt. Cf. *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453, 458 (1974).[34]

---

[34] MR. JUSTICE POWELL's dissent relies on cases decided under the National Environmental Policy Act to support its position that the 1973 Act should only apply to prospective actions of an agency. *Post,* at 205–206. The NEPA decisions, however, are completely inapposite. First, the two statutes serve different purposes. NEPA essentially imposes a procedural requirement on agencies, requiring them to engage in an extensive *inquiry* as to the effect of federal actions on the environment; by way of contrast, the 1973 Act is substantive in effect, designed to *prevent* the loss of any endangered species, regardless of the cost. Thus, it would make sense to hold NEPA inapplicable at some point in the life of a project, because the agency would no longer have a meaningful opportunity to *weigh* the benefits of the project versus the detrimental effects on the environment. Section 7, on the other hand, compels agencies not only to *consider* the effect of their projects on endangered species, but to take such actions as are necessary to *insure* that species are not extirpated as a result of federal activities. Second, even the NEPA cases have generally required agencies to file environmental impact statements when the remaining governmental action would be environmentally "significant." See, *e. g., Environmental Defense Fund* v. *TVA,* 468 F. 2d 1164, 1177 (CA6 1972). Under § 7, the loss of *any* endangered species has been determined by Congress to be environmentally "significant." See *supra,* at 177–179.

Notwithstanding Congress' expression of intent in 1973, we are urged to find that the continuing appropriations for Tellico Dam constitute an implied repeal of the 1973 Act, at least insofar as it applies to the Tellico Project. In support of this view, TVA points to the statements found in various House and Senate Appropriations Committees' Reports; as described in Part I, *supra,* those Reports generally reflected the attitude of the *Committees* either that the Act did not apply to Tellico or that the dam should be completed regardless of the provisions of the Act. Since we are unwilling to assume that these latter Committee statements constituted advice to ignore the provisions of a duly enacted law, we assume that these Committees believed that the Act simply was not applicable in this situation. But even under this interpretation of the Committees' actions, we are unable to conclude that the Act has been in any respect amended or repealed.

There is nothing in the appropriations measures, as passed, which states that the Tellico Project was to be completed irrespective of the requirements of the Endangered Species Act. These appropriations, in fact, represented relatively minor components of the lump-sum amounts for the *entire* TVA budget.[35] To find a repeal of the Endangered Species Act under these circumstances would surely do violence to the " 'cardinal rule . . . that repeals by implication are not favored.' " *Morton* v. *Mancari,* 417 U. S. 535, 549 (1974), quoting *Posadas* v. *National City Bank,* 296 U. S. 497, 503 (1936). In *Posadas* this Court held, in no uncertain terms, that "the intention of the legislature to repeal must be clear and manifest." *Ibid.* See *Georgia* v. *Pennsylvania R. Co.,*

[35] The Appropriations Acts did not themselves identify the projects for which the sums had been appropriated; identification of these projects requires reference to the legislative history. See n. 14, *supra.* Thus, unless a Member scrutinized in detail the Committee proceedings concerning the appropriations, he would have no knowledge of the possible conflict between the continued funding and the Endangered Species Act.

324 U. S. 439, 456–457 (1945) ("Only a clear repugnancy between the old . . . and the new [law] results in the former giving way . . ."); *United States* v. *Borden Co.,* 308 U. S. 188, 198–199 (1939) ("[I]ntention of the legislature to repeal 'must be clear and manifest'. . . . '[A] positive repugnancy [between the old and the new laws]' "); *Wood* v. *United States,* 16 Pet. 342, 363 (1842) ("[T]here must be a positive repugnancy . . ."). In practical terms, this "cardinal rule" means that "[i]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Mancari, supra,* at 550.

The doctrine disfavoring repeals by implication "applies with full vigor when . . . the subsequent legislation is an *appropriations* measure." *Committee for Nuclear Responsibility* v. *Seaborg,* 149 U. S. App. D. C. 380, 382, 463 F. 2d 783, 785 (1971) (emphasis added); *Environmental Defense Fund* v. *Froehlke,* 473 F. 2d 346, 355 (CA8 1972). This is perhaps an understatement since it would be more accurate to say that the policy applies with even *greater* force when the claimed repeal rests solely on an Appropriations Act. We recognize that both substantive enactments and appropriations measures are "Acts of Congress," but the latter have the limited and specific purpose of providing funds for authorized programs. When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden. Without such an assurance, every appropriations measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure. Not only would this lead to the absurd result of requiring Members to review exhaustively the background of every authorization before voting on an appropriation, but it would flout the very rules the Congress carefully adopted to avoid

this need. House Rule XXI (2), for instance, specifically provides:

> "No appropriation shall be reported in any general appropriation bill, or be in order as an amendment thereto, for any expenditure not previously authorized by law, unless in continuation of appropriations for such public works as are already in progress. *Nor shall any provision in any such bill or amendment thereto changing existing law be in order.*" (Emphasis added.)

See also Standing Rules of the Senate, Rule 16.4. Thus, to sustain petitioner's position, we would be obliged to assume that Congress meant to repeal *pro tanto* § 7 of the Act by means of a procedure expressly prohibited under the rules of Congress.

Perhaps mindful of the fact that it is "swimming upstream" against a strong current of well-established precedent, TVA argues for an exception to the rule against implied repealers in a circumstance where, as here, Appropriations Committees have expressly stated their "understanding" that the earlier legislation would not prohibit the proposed expenditure. We cannot accept such a proposition. Expressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress, particularly not in the circumstances presented by this case. First, the Appropriations Committees had no jurisdiction over the subject of endangered species, much less did they conduct the type of extensive hearings which preceded passage of the earlier Endangered Species Acts, especially the 1973 Act. We venture to suggest that the House Committee on Merchant Marine and Fisheries and the Senate Committee on Commerce would be somewhat surprised to learn that their careful work on the substantive legislation had been undone by the simple—and brief— insertion of some inconsistent language in Appropriations Committees' Reports.

Second, there is no indication that Congress as a whole was aware of TVA's position, although the Appropriations Committees apparently agreed with petitioner's views. Only recently, in *SEC* v. *Sloan*, 436 U. S. 103 (1978), we declined to presume general congressional acquiescence in a 34-year-old practice of the Securities and Exchange Commission, despite the fact that the Senate Committee *having jurisdiction over the Commission's activities* had long expressed approval of the practice. MR. JUSTICE REHNQUIST, speaking for the Court, observed that we should be "extremely hesitant to presume general congressional awareness of the Commission's construction based only upon a few isolated statements in the thousands of pages of legislative documents." *Id.*, at 121. *A fortiori,* we should not assume that petitioner's views—and the Appropriations Committees' acceptance of them—were any better known, especially when the TVA is not the agency with primary responsibility for administering the Endangered Species Act.

Quite apart from the foregoing factors, we would still be unable to find that in this case "the earlier and later statutes are irreconcilable," *Mancari,* 417 U. S., at 550; here it is entirely possible "to regard each as effective." *Id.*, at 551. The starting point in this analysis must be the legislative proceedings leading to the 1977 appropriations since the earlier funding of the dam occurred prior to the listing of the snail darter as an endangered species. In all successive years, TVA confidently reported to the Appropriations Committees that efforts to transplant the snail darter appeared to be successful; this surely gave those Committees some basis for the impression that there was no direct conflict between the Tellico Project and the Endangered Species Act. Indeed, the special appropriation for 1978 of $2 million for transplantation of endangered species supports the view that the Committees saw such relocation as the means whereby collision between Tellico and the Endangered Species Act could be avoided. It should also

be noted that the Reports issued by the Senate and House Appropriations Committees in 1976 came within a month of the District Court's decision in this case, which hardly could have given the Members cause for concern over the possible applicability of the Act. This leaves only the 1978 appropriations, the Reports for which issued after the Court of Appeals' decision now before us. At that point very little remained to be accomplished on the project; the Committees understandably advised TVA to cooperate with the Department of the Interior "to relocate the endangered species to another suitable habitat so as to permit the project to proceed as rapidly as possible." H. R. Rep. No. 95-379, p. 11 (1977). It is true that the *Committees* repeated their earlier expressed "view" that the Act did not prevent completion of the Tellico Project. Considering these statements in context, however, it is evident that they " 'represent only the personal views of these legislators,' " and "however explicit, [they] cannot serve to change the legislative intent of Congress expressed before the Act's passage." *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 132 (1974).

(B)

Having determined that there is an irreconcilable conflict between operation of the Tellico Dam and the explicit provisions of § 7 of the Endangered Species Act, we must now consider what remedy, if any, is appropriate. It is correct, of course, that a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law. This Court made plain in *Hecht Co.* v. *Bowles,* 321 U. S. 321, 329 (1944), that "[a] grant of *jurisdiction* to issue compliance orders hardly suggests an absolute duty to do so under any and all circumstances." As a general matter it may be said that "[s]ince all or almost all equitable remedies are discretionary, the balancing of equities and hardships is appropriate in almost any case as a guide to the chancellor's discretion." D. Dobbs, Remedies 52 (1973). Thus, in *Hecht*

*Co.* the Court refused to grant an injunction when it appeared from the District Court findings that "the issuance of an injunction would have 'no effect by way of insuring better compliance in the future' and would [have been] 'unjust' to [the] petitioner and not 'in the public interest.' " 321 U. S., at 326.

But these principles take a court only so far. Our system of government is, after all, a tripartite one, with each branch having certain defined functions delegated to it by the Constitution. While "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury* v. *Madison,* 1 Cranch 137, 177 (1803), it is equally—and emphatically—the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought.

Here we are urged to view the Endangered Species Act "reasonably," and hence shape a remedy "that accords with some modicum of common sense and the public weal." *Post,* at 196. But is that our function? We have no expert knowledge on the subject of endangered species, much less do we have a mandate from the people to strike a balance of equities on the side of the Tellico Dam. Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as "institutionalized caution."

Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not

sit as a committee of review, nor are we vested with the power of veto. The lines ascribed to Sir Thomas More by Robert Bolt are not without relevance here:

> "The law, Roper, the law. I know what's legal, not what's right. And I'll stick to what's legal. . . . I'm *not* God. The currents and eddies of right and wrong, which you find such plain-sailing, I can't navigate, I'm no voyager. But in the thickets of the law, oh there I'm a forester. . . . What would you do? Cut a great road through the law to get after the Devil? . . . And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? . . . This country's planted thick with laws from coast to coast—Man's laws, not God's—and if you cut them down . . . d'you really think you could stand upright in the winds that would blow them? . . . Yes, I'd give the Devil benefit of law, for my own safety's sake." R. Bolt, A Man for All Seasons, Act I, p. 147 (Three Plays, Heinemann ed. 1967).

We agree with the Court of Appeals that in our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with "common sense and the public weal." Our Constitution vests such responsibilities in the political branches.

*Affirmed.*

MR. JUSTICE POWELL, with whom MR. JUSTICE BLACKMUN joins, dissenting.

The Court today holds that § 7 of the Endangered Species Act requires a federal court, for the purpose of protecting an endangered species or its habitat, to enjoin permanently the operation of any federal project, whether completed or substantially completed. This decision casts a long shadow over the operation of even the most important projects, serving

vital needs of society and national defense, whenever it is determined that continued operation would threaten extinction of an endangered species or its habitat. This result is said to be required by the "plain intent of Congress" as well as by the language of the statute.

In my view § 7 cannot reasonably be interpreted as applying to a project that is completed or substantially completed [1] when its threat to an endangered species is discovered. Nor can I believe that Congress could have intended this Act to produce the "absurd result"—in the words of the District Court—of this case. If it were clear from the language of the Act and its legislative history that Congress intended to authorize this result, this Court would be compelled to enforce it. It is not our province to rectify policy or political judgments by the Legislative Branch, however egregiously they may disserve the public interest. But where the statutory language and legislative history, as in this case, need not be construed to reach such a result, I view it as the duty of this Court to adopt a permissible construction that accords with some modicum of common sense and the public weal.

## I

Although the Court has stated the facts fully, and fairly presented the testimony and action of the Appropriations Committees relevant to this case, I now repeat some of what has been said. I do so because I read the total record as compelling rejection of the Court's conclusion that Congress *intended* the Endangered Species Act to apply to completed or substantially completed projects such as the dam and reservoir project that today's opinion brings to an end—absent relief by Congress itself.

---

[1] Attorney General Bell advised us at oral argument that the dam had been completed, that all that remains is to "[c]lose the gate," and to complete the construction of "some roads and bridges." The "dam itself is finished. All the landscaping has been done . . . . [I]t is completed." Tr. of Oral Arg. 18.

In 1966, Congress authorized and appropriated initial funds for the construction by the Tennessee Valley Authority (TVA) of the Tellico Dam and Reservoir Project on the Little Tennessee River in eastern Tennessee. The Project is a comprehensive water resource and regional development project designed to control flooding, provide water supply, promote industrial and recreational development, generate some additional electric power within the TVA system, and generally improve economic conditions in an economically depressed area "characterized by underutilization of human resources and outmigration of young people." [2]

Construction began in 1967, and Congress has voted funds for the Project in every year since. In August 1973, when the Tellico Project was half completed, a new species of fish known as the snail darter [3] was discovered in the portion of the Little Tennessee River that would be impounded behind Tellico Dam. The Endangered Species Act was passed the following December. 87 Stat. 884, 16 U. S. C. § 1531 *et seq.* (1976 ed.). More than a year later, in January 1975, respondents joined others in petitioning the Secretary of the Interior to list the snail darter as an endangered species. On November 10, 1975, when the Tellico Project was 75% completed, the Secretary placed the snail darter on the endangered list and concluded that the "proposed impoundment of water behind

---

[2] Hearings on Public Works for Water and Power Development and Energy Research Appropriation Bill, 1977, before a Subcommittee of the House Committee on Appropriations, 94th Cong., 2d Sess., pt. 5, p. 261 (1976).

[3] Although the snail darter is a distinct species, it is hardly an extraordinary one. Even icthyologists familiar with the snail darter have difficulty distinguishing it from several related species. App. 107, 131. Moreover, new species of darters are discovered in Tennessee at the rate of about 1 a year; 8 to 10 have been discovered in the last five years. *Id.,* at 131. All told, there are some 130 species of darters, 85 to 90 of which are found in Tennessee, 40 to 45 in the Tennessee River system, and 11 in the Little Tennessee itself. *Id.,* at 38 n. 7, 130–131.

the proposed Tellico Dam would result in total destruction of the snail darter's habitat." 40 Fed. Reg. 47506 (1975). In respondents' view, the Secretary's action meant that completion of the Tellico Project would violate § 7 of the Act, 16 U. S. C. § 1536 (1976 ed.):

> "All . . . Federal departments and agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species . . . listed pursuant to section 1533 of this title and by taking such action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of such endangered species and threatened species or result in the destruction or modification of habitat of such species which is determined by the Secretary . . . to be critical."

TVA nevertheless determined to continue with the Tellico Project in accordance with the prior authorization by Congress. In February 1976, respondents filed the instant suit to enjoin its completion. By that time the Project was 80% completed.

In March 1976, TVA informed the House and Senate Appropriations Committees about the Project's threat to the snail darter and about respondents' lawsuit. Both Committees were advised that TVA was attempting to preserve the fish by relocating them in the Hiwassee River, which closely resembles the Little Tennessee. It stated explicitly, however, that the success of those efforts could not be guaranteed.[4]

---

[4] Hearings on Public Works for Water and Power Development and Energy Research Appropriations Bill, 1977, before a Subcommittee of the House Committee on Appropriations, 94th Cong., 2d Sess., pt. 5, pp. 261–262 (1976); Hearings on Public Works for Water and Power Development and Energy Research Appropriations for Fiscal Year 1977, before a Sub-

In a decision of May 25, 1976, the District Court for the Eastern District of Tennessee held that "the Act should not be construed as preventing completion of the project."[5] 419 F. Supp. 753, 755 n. 2. An opposite construction, said the District Court, would be unreasonable:

> "At some point in time a federal project becomes so near completion and so incapable of modification that a court of equity should not apply a statute enacted long after inception of the project to produce an unreasonable result. *Arlington Coalition on Transportation* v. *Volpe,* 458 F. 2d 1323, 1331–32 (4th Cir.), *cert. den.* 409 U. S. 1000 . . . (1972). Where there has been an irreversible and irretrievable commitment of resources by Congress to a project over a span of almost a decade, the Court should proceed with a great deal of circumspection." *Id.*, at 760.

Observing that respondents' argument, carried to its logical extreme, would require a court to enjoin the impoundment of

committee of the Senate Committee on Appropriations, 94th Cong., 2d Sess., pt. 4, pp. 3096–3099 (1976).

[5] The Court of Appeals interpreted the District Court opinion as holding that TVA's continuation of the Tellico Project would violate the Act, but that the requested injunction should be denied on equitable grounds. 549 F. 2d 1064, 1069–1070 (CA6 1977). This interpretation of the District Court opinion appears untenable in light of that opinion's conclusion that the Act could "not be *construed* as preventing completion of the project," 419 F. Supp. 753, 755 n. 2 (1976) (emphasis added). Moreover, the District Court stated the issue in the case as whether "[it is] reasonable to conclude that Congress intended the Act to halt the Tellico Project at its present stage of completion." *Id.*, at 760. It concluded that the "Act should be construed in a reasonable manner to effectuate the legislative purpose," *ibid.*, and "that the Act does not operate in such a manner as to halt the completion of this particular project," *id.*, at 763. From all this, together with the District Court's reliance on cases interpreting the National Environmental Policy Act, 42 U. S. C. § 4321 *et seq.*, as inapplicable to substantially completed projects, see 419 F. Supp., at 760–761, it seems clear that District Judge Taylor correctly interpreted § 7 as inapplicable to the Tellico Project.

water behind a fully completed dam if an endangered species were discovered in the river on the day before the scheduled impoundment, the District Court concluded that Congress could not have intended such a result.[6]   Accordingly, it denied the prayer for an injunction and dismissed the action.

In 1975, 1976, and 1977, Congress, with full knowledge of the Tellico Project's effect on the snail darter and the alleged violation of the Endangered Species Act, continued to appropriate money for the completion of the Project.   In doing so, the Appropriations Committees expressly stated that the Act did not prohibit the Project's completion, a view that Congress presumably accepted in approving the appropriations each year.   For example, in June 1976, the Senate Committee on Appropriations released a report noting the District Court decision and recommending approval of TVA's full budget request for the Tellico Project.   The Committee observed further that it did "not view the Endangered Species Act as prohibiting the completion of the Tellico project at its advanced stage," and it directed "that this project be completed as promptly as possible in the public interest." [7]   The appropriations bill was passed by Congress and approved by the President.

The Court of Appeals for the Sixth Circuit nevertheless reversed the District Court in January 1977.   It held that the Act was intended to create precisely the sort of dramatic conflict presented in this case: "Where a project is on-going and substantial resources have already been expended, the conflict between national incentives to conserve living things and the pragmatic momentum to complete the project on schedule is most incisive."   549 F. 2d 1064, 1071.   Judicial reso-

---

[6] The District Court found that $53 million out of more than $78 million then expended on the Project would be unrecoverable if completion of the dam were enjoined.   419 F. Supp., at 760.   As more than $110 million has now been spent on the Project, it seems probable that abandonment of the dam would entail an even greater waste of tax dollars.

[7] S. Rep. No. 94–960, p. 96 (1976).

lution of that conflict, the Court of Appeals reasoned, would represent usurpation of legislative power. It quoted the District Court's statement that respondents' reading of the Act, taken to its logical extreme, would compel a court to halt impoundment of water behind a dam if an endangered species were discovered in the river on the day before the scheduled impoundment. The Court of Appeals, however, rejected the District Court's conclusion that such a reading was unreasonable and contrary to congressional intent, holding instead that "[c]onscientious enforcement of the Act requires that it be taken to its logical extreme." *Ibid.* It remanded with instructions to issue a permanent injunction halting all activities incident to the Tellico Project that would modify the critical habitat of the snail darter.

In June 1977, and after being informed of the decision of the Court of Appeals, the Appropriations Committees in both Houses of Congress again recommended approval of TVA's full budget request for the Tellico Project. Both Committees again stated unequivocally that the Endangered Species Act was not intended to halt projects at an advanced stage of completion:

> "[The Senate] Committee has not viewed the Endangered Species Act as preventing the completion and use of these projects which were well under way at the time the affected species were listed as endangered. If the act has such an effect, which is contrary to the Committee's understanding of the intent of Congress in enacting the Endangered Species Act, funds should be appropriated to allow these projects to be completed and their benefits realized in the public interest, the Endangered Species Act notwithstanding." [8]

> "It is the [House] Committee's view that the Endangered Species Act was not intended to halt projects such

---

[8] S. Rep. No. 95–301, p. 99 (1977).

as these in their advanced stage of completion, and [the Committee] strongly recommends that these projects not be stopped because of misuse of the Act." [9]

Once again, the appropriations bill was passed by both Houses and signed into law.

## II

Today the Court, like the Court of Appeals below, adopts a reading of § 7 of the Act that gives it a retroactive effect and disregards 12 years of consistently expressed congressional intent to complete the Tellico Project. With all due respect, I view this result as an extreme example of a literalist [10] construction, not required by the language of the Act and adopted without regard to its manifest purpose. Moreover, it ignores established canons of statutory construction.

## A

The starting point in statutory construction is, of course, the language of § 7 itself. *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring). I agree that it can be viewed as a textbook example of fuzzy language, which can be read according to the "eye of the beholder." [11] The critical words direct all federal agencies to take "such action [as may be] necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of . . . endangered species . . . or result in the destruction or modification of [a critical] habitat of such species . . . ." Respondents—as did

---

[9] H. R. Rep. No. 95–379, p. 104 (1977).

[10] See Frank, Words and Music: Some Remarks on Statutory Interpretation, 47 Colum. L. Rev. 1259, 1263 (1947); Hand, The Speech of Justice, 29 Harv. L. Rev. 617, 620 (1916).

[11] The purpose of this Act is admirable. Protection of endangered species long has been neglected. This unfortunate litigation—wasteful for taxpayers and likely in the end to be counterproductive in terms of respondents' purpose—may have been invited by careless draftsmanship of otherwise meritorious legislation.

the Sixth Circuit—read these words as sweepingly as possible to include all "actions" that any federal agency ever may take with respect to any federal project, whether completed or not.

The Court today embraces this sweeping construction. *Ante,* at 184–188. Under the Court's reasoning, the Act covers every existing federal installation, including great hydroelectric projects and reservoirs, every river and harbor project, and every national defense installation—however essential to the Nation's economic health and safety. The "actions" that an agency would be prohibited from "carrying out" would include the continued operation of such projects or any change necessary to preserve their continued usefulness.[12] The only precondition, according to respondents, to thus destroying the usefulness of even the most important federal project in our country would be a finding by the Secretary of the Interior

---

[12] *Ante,* at 184–188. At oral argument, respondents clearly stated this as their view of § 7:

"QUESTION: . . . Do you think—it is still your position, as I understand it, that this Act, Section 7, applies to completed projects? I know you don't think it occurs very often that there'll be a need to apply it. But does it apply if the need exists?

"MR. PLATER: To the continuation—

"QUESTION: To completed projects. Take the Grand Coulee dam—

"MR. PLATER: Right. Your Honor, if there were a species there—

.          .          .          .          .

"—it wouldn't be endangered by the dam.

"QUESTION: I know that's your view. I'm asking you not to project your imagination—

"MR. PLATER: I see, your Honor.

"QUESTION: —beyond accepting my assumption.

"MR. PLATER: Right.

"QUESTION: And that was that an endangered species might turn up at Grand Coulee. Does Section 7 apply to it?

"MR. PLATER: I believe it would, Your Honor. The Secretary of the Interior—

"QUESTION: That answers my question.

"MR. PLATER: Yes, it would." Tr. of Oral Arg. 57–58.

that a continuation of the project would threaten the survival or critical habitat of a newly discovered species of water spider or amoeba.[13]

"[F]requently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act." *Church of the Holy Trinity* v. *United States,* 143 U. S. 457, 459 (1892).[14] The

---

[13] Under the Court's interpretation, the prospects for such disasters are breathtaking indeed, since there are hundreds of thousands of candidates for the endangered list:

" 'The act covers every animal and plant species, subspecies, and population in the world needing protection. There are approximately 1.4 million full species of animals and 600,000 full species of plants in the world. Various authorities calculate as many as 10% of them—some 200,000—may need to be listed as Endangered or Threatened. When one counts in subspecies, not to mention individual populations, the total could increase to three to five times that number.' " Keith Shreiner, Associate Director and Endangered Species Program Manager of the U. S. Fish and Wildlife Service, quoted in a letter from A. J. Wagner, Chairman, TVA, to Chairman, House Committee on Merchant Marine and Fisheries, dated Apr. 25, 1977, quoted in Wood, On Protecting an Endangered Statute: The Endangered Species Act of 1973, 37 Federal B. J. 25, 27 (1978).

[14] Accord, *e. g., United States* v. *American Trucking Assns.,* 310 U. S. 534, 543 (1940); *Armstrong Co.* v. *Nu-Enamel Corp.,* 305 U. S. 315, 333 (1938); *Sorrells* v. *United States,* 287 U. S. 435, 446–448 (1932) (collecting cases); *United States* v. *Ryan,* 284 U. S. 167, 175 (1931). The Court suggests, *ante,* at 187 n. 33, that the precept stated in *Church of the Holy Trinity* was somehow undermined in *Crooks* v. *Harrelson,* 282 U. S. 55, 60 (1930). Only a year after the decision in *Crooks,* however, the Court declared that a "literal application of a statute which would lead to absurd consequences is to be avoided whenever a reasonable application can be given which is consistent with the legislative purpose." *Ryan, supra,* at 175. In the following year, the Court expressly relied upon *Church of the Holy Trinity* on this very point. *Sorrells, supra,* at 448. The real difference between the Court and myself on this issue arises from our per-

result that will follow in this case by virtue of the Court's reading of § 7 makes it unreasonable to believe that Congress intended that reading. Moreover, §7 may be construed in a way that avoids an "absurd result" without doing violence to its language.

The critical word in § 7 is "actions" and its meaning is far from "plain.", It is part of the phrase: "actions authorized, funded or carried out." In terms of planning and executing various activities, it seems evident that the "actions" referred to are not all actions that an agency can ever take, but rather actions that the agency is *deciding whether* to authorize, to fund, or to carry out. In short, these words reasonably may be read as applying only to *prospective actions, i. e.,* actions with respect to which the agency has reasonable decision-making alternatives still available, actions *not yet* carried out. At the time respondents brought this lawsuit, the Tellico Project was 80% complete at a cost of more than $78 million. The Court concedes that as of this time and for the purpose of deciding this case, the Tellico Dam Project is "completed" or "virtually completed and the dam is essentially ready for operation," *ante,* at 156, 157–158. See n. 1, *supra.* Thus, under a prospective reading of § 7, the action already had been "carried out" in terms of any remaining reasonable decision-making power. Cf. *National Wildlife Federation* v. *Coleman,* 529 F. 2d 359, 363, and n. 5 (CA5), cert. denied *sub nom. Boteler* v. *National Wildlife Federation,* 429 U. S. 979 (1976).

This is a reasonable construction of the language and also is supported by the presumption against construing statutes to give them a retroactive effect. As this Court stated in

ceptions of the character of today's result. The Court professes to find nothing particularly remarkable about the result produced by its decision in this case. Because I view it as remarkable indeed, and because I can find no hint that Congress actually intended it, see *infra,* at 207–210, I am led to conclude that the congressional words cannot be given the meaning ascribed to them by the Court.

*United States Fidelity & Guaranty Co.* v. *United States ex rel. Struthers Wells Co.,* 209 U. S. 306, 314 (1908), the "presumption is very strong that a statute was not meant to act retrospectively, and it ought never to receive such a construction if it is susceptible of any other." This is particularly true where a statute enacts a new regime of regulation. For example, the presumption has been recognized in cases under the National Environmental Policy Act, 42 U. S. C. § 4321 *et seq.,* holding that the requirement of filing an environmental impact statement cannot reasonably be applied to projects substantially completed. *E. g., Pizitz, Inc.* v. *Volpe,* 467 F. 2d 208 (CA5 1972); *Ragland* v. *Mueller,* 460 F. 2d 1196 (CA5 1972); *Greene County Planning Board* v. *FPC,* 455 F. 2d 412, 424 (CA2), cert. denied, 409 U. S. 849 (1972). The Court of Appeals for the Fourth Circuit explained these holdings.

> "Doubtless Congress did not intend that all projects ongoing at the effective date of the Act be subject to the requirements of Section 102. At some stage of progress, the costs of altering or abandoning the project could so definitely outweigh whatever benefits that might accrue therefrom that it might no longer be 'possible' to change the project in accordance with Section 102. At some stage, federal action may be so 'complete' that applying the Act could be considered a 'retroactive' application not intended by the Congress." *Arlington Coalition on Transportation* v. *Volpe,* 458 F. 2d 1323, 1331, cert. denied *sub nom. Fugate* v. *Arlington Coalition on Transportation,* 409 U. S. 1000 (1972).

Similarly under § 7 of the Endangered Species Act, at some stage of a federal project, and certainly where a project has been completed, the agency no longer has a reasonable choice simply to abandon it. When that point is reached, as it was in this case, the presumption against retrospective interpretation is at its strongest. The Court today gives no weight to that presumption.

## B

The Court recognizes that the first purpose of statutory construction is to ascertain the intent of the legislature. *E. g., United States* v. *American Trucking Assns.*, 310 U. S. 534, 542 (1940).[15] The Court's opinion reviews at length the legislative history, with quotations from Committee Reports and statements by Members of Congress. The Court then ends this discussion with curiously conflicting conclusions.

It finds that the "totality of congressional action makes it abundantly clear that the result we reach today [justifying the termination or abandonment of any federal project] is wholly in accord with both the words of the statute and the intent of Congress." *Ante,* at 184. Yet, in the same paragraph, the Court acknowledges that "there is no discussion in the legislative history of precisely this problem." The opinion nowhere makes clear how the result it reaches can be "abundantly" self-evident from the legislative history when the result was never discussed. While the Court's review of the legislative history establishes that Congress intended to require governmental agencies to take endangered species into account in the planning and execution of their programs,[16] there is not

---

[15] Landis, A Note on "Statutory Interpretation," 43 Harv. L. Rev. 886 (1930).

[16] The quotations from the legislative history relied upon by the Court are reasonably viewed as demonstrating that Congress was thinking about agency action in prospective situations, rather than actions requiring abandonment of completed projects. For example, the Court quotes Representative Dingell's statement as a highly pertinent interpretation of what the Conference bill intended. In the statement relied upon, *ante,* at 183–184, Representative Dingell said that Air Force bombing activities along the gulf coast of Texas, if found to endanger whooping cranes, would have to be discontinued. With respect to grizzly bears, he noted that they may or may not be endangered, but under the Act it will be necessary "to take action to see . . . that these bears are not driven to extinction."

The Court also predicates its holding as to legislative intent upon the provision in the Act that instructs federal agencies not to "take" endangered

even a hint in the legislative history that Congress intended to compel the undoing or abandonment of any project or program later found to threaten a newly discovered species.[17]

If the relevant Committees that considered the Act, and the Members of Congress who voted on it, had been aware that the Act could be used to terminate major federal projects authorized years earlier and nearly completed, or to require the abandonment of essential and long-completed federal instal-

species, meaning that no one is "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" such life forms. *Ante,* at 184–185. The Court quotes, *ante,* at 184–185, n. 30, the Secretary of the Interior's definition of the term "harm" to mean—among other things—any act which "annoy[s wild life] to such an extent as to significantly disrupt essential behavioral patterns, which include, but are not limited to, breeding, feeding or sheltering; significant environmental modification or degradation which has such effects is included within the meaning of 'harm.'" 50 CFR § 17.3 (1976). Two observations are pertinent. First, the reach of this regulation—which the Court accepts as authorized by the Act—is virtually limitless. All one would have to find is that the "essential behavioral patterns" of any living species as to breeding, feeding, or sheltering are significantly disrupted by the operation of an existing project.

I cannot believe that Congress would have gone this far to imperil every federal project, however important, on behalf of any living species however unimportant, without a clear declaration of that intention. The more rational interpretation is consistent with Representative Dingell's obvious thinking: The Act is addressed to prospective action where reasonable options exist; no thought was given to abandonment of completed projects.

[17] The Senate sponsor of the bill, Senator Tunney, apparently thought that the Act was merely precatory and would not withdraw from the agency the final decision on completion of the project:

"[A]s I understand it, after the consultation process took place, the Bureau of Public Roads, or the Corps of Engineers, would not be prohibited from building a road if they deemed it necessary to do so.

"[A]s I read the language, there has to be consultation. However, the Bureau of Public Roads or any other agency would have the final decision as to whether such a road should be built. That is my interpretation of the legislation at any rate." 119 Cong. Rec. 25689–25690 (1973). See also *Sierra Club* v. *Froehlke,* 534 F. 2d 1289, 1303–1304 (CA8 1976).

lations and edifices,[18] we can be certain that there would have been hearings, testimony, and debate concerning consequences so wasteful, so inimical to purposes previously deemed important, and so likely to arouse public outrage. The absence of any such consideration by the Committees or in the floor debates indicates quite clearly that no one participating in the legislative process considered these consequences as within the intendment of the Act.

As indicated above, this view of legislative intent at the time of enactment is abundantly confirmed by the subsequent congressional actions and expressions. We have held, properly, that post-enactment statements by individual Members of Congress as to the meaning of a statute are entitled to little or no weight. See, e. g., Regional Rail Reorganization Act Cases, 419 U. S. 102, 132 (1974). The Court also has recognized that subsequent Appropriations Acts themselves are not necessarily entitled to significant weight in determining whether a prior statute has been superseded. See United States v. Langston, 118 U. S. 389, 393 (1886). But these precedents are inapposite. There was no effort here to "bootstrap" a post-enactment view of prior legislation by isolated statements of individual Congressmen. Nor is this a case where Congress, without explanation or comment upon the statute in question, merely has voted apparently inconsistent finan-

---

[18] The initial proposed rulemaking under the Act made it quite clear that such an interpretation was not intended:

"Neither [the Fish and Wildlife Service of the Department of the Interior] nor [the National Marine Fisheries Service of the Department of Commerce] intends that section 7 bring about the waste that can occur if an advanced project is halted. . . . The affected agency must decide whether the degree of completion and extent of public funding of particular projects justify an action that may be otherwise inconsistent with section 7." 42 Fed. Reg. 4869 (1977).

After the decision of the Court of Appeals in this case, however, the quoted language was withdrawn, and the agencies adopted the view of the court. 43 Fed. Reg. 870, 872, 875 (1978).

cial support in subsequent Appropriations Acts. Testimony on this precise issue was presented before congressional committees, and the Committee Reports for three consecutive years addressed the problem and affirmed their understanding of the original congressional intent. We cannot assume—as the Court suggests—that Congress, when it continued each year to approve the recommended appropriations, was unaware of the contents of the supporting Committee Reports. All this amounts to strong corroborative evidence that the interpretation of § 7 as not applying to completed or substantially completed projects reflects the initial legislative intent. See, e. g., *Fleming* v. *Mohawk Wrecking & Lumber Co.,* 331 U. S. 111, 116 (1947); *Brooks* v. *Dewar,* 313 U. S. 354 (1941).

### III

I have little doubt that Congress will amend the Endangered Species Act to prevent the grave consequences made possible by today's decision. Few, if any, Members of that body will wish to defend an interpretation of the Act that requires the waste of at least $53 million, see n. 6, *supra,* and denies the people of the Tennessee Valley area the benefits of the reservoir that Congress intended to confer.[19] There will be little sentiment to leave this dam standing before an empty reservoir, serving no purpose other than a conversation piece for incredulous tourists.

But more far reaching than the adverse effect on the people of this economically depressed area is the continuing threat to the operation of every federal project, no matter how important to the Nation. If Congress acts expeditiously, as may be anticipated, the Court's decision probably will have no lasting adverse consequences. But I had not thought it to be the province of this Court to force Congress into otherwise

---

[19] The Court acknowledges, as it must, that the permanent injunction it grants today will require "the sacrifice of the anticipated benefits of the project and of many millions of dollars in public funds." *Ante,* at 174.

unnecessary action by interpreting a statute to produce a result no one intended.

Mr. Justice Rehnquist, dissenting.

In the light of my Brother Powell's dissenting opinion, I am far less convinced than is the Court that the Endangered Species Act of 1973, 16 U. S. C. § 1531 *et seq.* (1976 ed.), was intended to prohibit the completion of the Tellico Dam. But the very difficulty and doubtfulness of the correct answer to this legal question convinces me that the Act did *not* prohibit the District Court from refusing, in the exercise of its traditional equitable powers, to enjoin petitioner from completing the Dam. Section 11 (g)(1) of the Act, 16 U. S. C. § 1540 (g) (1) (1976 ed.), merely provides that "any person may commence a civil suit on his own behalf . . . to enjoin any person, including the United States and any other governmental instrumentality or agency . . . , who is alleged to be in violation of any provision of this chapter." It also grants the district courts "jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision."

This Court had occasion in *Hecht Co.* v. *Bowles,* 321 U. S. 321 (1944), to construe language in an Act of Congress that lent far greater support to a conclusion that Congress intended an injunction to issue as a matter of right than does the language just quoted. There the Emergency Price Control Act of 1942 provided that

> "[u]pon a showing by the Administrator that [a] person has engaged or is about to engage in any [acts or practices violative of this Act] a permanent or temporary injunction, restraining order, or other order *shall be granted* without bond." 56 Stat. 33 (emphasis added).

But in *Hecht* this Court refused to find even in such language an intent on the part of Congress to require that a

district court issue an injunction as a matter of course without regard to established equitable considerations, saying:

> "Only the other day we stated that 'An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity.' . . . The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied. . . . [I]f Congress desired to make such an abrupt departure from traditional equity practice as is suggested, it would have made its desire plain." 321 U. S., at 329–330.

Only by sharply retreating from the principle of statutory construction announced in *Hecht Co.* could I agree with the Court of Appeals' holding in this case that the judicial enforcement provisions contained in § 11 (g)(1) of the Act require automatic issuance of an injunction by the district courts once a violation is found. I choose to adhere to *Hecht Co.*'s teaching:

> "A grant of *jurisdiction* to issue compliance orders hardly suggests an absolute duty to do so under any and all circumstances. We cannot but think that if Congress had intended to make such a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made." 321 U. S., at 329.

Since the District Court possessed discretion to refuse injunctive relief even though it had found a violation of the Act, the

only remaining question is whether this discretion was abused in denying respondents' prayer for an injunction. *Locomotive Engineers* v. *Missouri, K. & T. R. Co.*, 363 U. S. 528, 535 (1960). The District Court denied respondents injunctive relief because of the significant public and social harms that would flow from such relief and because of the demonstrated good faith of petitioner. As the Court recognizes, *ante*, at 193, such factors traditionally have played a central role in the decisions of equity courts whether to deny an injunction. See also 7 J. Moore, Federal Practice ¶ 65.18 [3] (1972); *Yakus* v. *United States*, 321 U. S. 414, 440–441 (1944). This Court has specifically held that a federal court can refuse to order a federal official to take specific action, even though the action might be required by law, if such an order "would work a public injury or embarrassment" or otherwise "be prejudicial to the public interest." *United States ex rel. Greathouse* v. *Dern*, 289 U. S. 352, 360 (1933). Here the District Court, confronted with conflicting evidence of congressional purpose, was on even stronger ground in refusing the injunction.

Since equity is "the instrument for nice adjustment and reconciliation between the public interest and private needs," *Hecht Co., supra*, at 329–330, a decree in one case will seldom be the exact counterpart of a decree in another. See, *e. g.*, *Eccles* v. *People's Bank*, 333 U. S. 426 (1948); *Penn Mutual Life Ins. Co.* v. *Austin*, 168 U. S. 685 (1898). Here the District Court recognized that Congress, when it enacted the Endangered Species Act, made the preservation of the habitat of the snail darter an important public concern. But it concluded that this interest on one side of the balance was more than outweighed by other equally significant factors. These factors, further elaborated in the dissent of my Brother POWELL, satisfy me that the District Court's refusal to issue an injunction was not an abuse of its discretion. I therefore dissent from the Court's opinion holding otherwise.